In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00112-CV**
_____

**COMPASS BANK, Appellant**

**V.**

**EVERETT WAYNE COLLIER AND JAN COLLIER, Appellees**

**On Appeal from the 172nd District Court**
**Jefferson County, Texas**
**Trial Cause No. E-197,975**

---

## MEMORANDUM OPINION

Everett Wayne Collier and Jan Collier (the "Colliers")[1] filed suit against Compass Bank ("Compass") asserting multiple claims and sought injunctive relief to prevent Compass from foreclosing on their home, following their default on the mortgage and repeated loan modification attempts. The Colliers alleged Compass breached a contract to modify the loan, violated the Texas Deceptive Trade

---

[1] For purposes of clarity, when referring to the Colliers individually, we use their first names.

Practices-Consumer Protection Act (DTPA), and violated the Texas Debt Collection Act (TDCA). *See* Tex. Bus. & Com. Code Ann. §§ 17.41 *et seq.*; Tex. Fin. Code Ann. §§ 392.001 *et seq.* A jury found that Compass breached a July 10, 2013 letter agreement ("Commitment Letter"), that Compass's conduct after December 29, 2013, knowingly violated the DTPA, and that Compass's conduct after December 29, 2013 violated the TDCA.

The Colliers elected to receive damages under the DTPA. The trial court subsequently entered a judgment based on the jury's findings awarding the Colliers total damages of $168,122.25. The award included the following elements of damages: $80,995.45 for past damages reduced to $56,696.81 based on the jury's finding that Compass was seventy percent responsible for the harm;[2] $8,161.50 through November 14, 2018, and additional prejudgment interest at the rate of $7.76 per day from November 14, 2018 until the day before signing of the judgment; $105,000.00 in additional damages based on the jury's finding that Compass knowingly violated the DTPA; $75,000.00 in attorney's fees in the trial court; and potentially $110,000.00 in attorney's fees if they successfully defend appeals at the intermediate level and before the Supreme Court. The judgment also provided that

---

[2] The trial court's judgment stated that the past damages were comprised of "$72,995.45 for the difference, if any, in the value of the agreement as it was received and the value it would have had if it had been as represented, $4,000 for Everett's mental anguish, and $4,000 for Jan's mental anguish[.]"

Compass was entitled to an offset in the amount of $76,961.10 "in full and final satisfaction of its mortgage interest."

Compass timely appealed, raising five issues along with various sub-issues asserting: (1) the Colliers' breach of contract claim fails; (2) the Colliers' DTPA claim fails; (3) the Colliers' TDCA claim fails; (4) the damages are unrecoverable; and (5) the Colliers' claims are barred by res judicata and/or judicial estoppel because of admissions and omissions in a bankruptcy proceeding. We reverse and render judgment on the Colliers' DTPA and TDCA claims, and we reverse and remand the Colliers' breach of contract claim for a new trial on the merits.

## I. Background

The evidence at trial established that in 2003, the Colliers refinanced their original loan from Community Bank to fund a home expansion project. Subsequently, Compass acquired Community Bank and the Colliers' mortgage. At trial, Everett, an independent insurance agent by profession, testified that he began experiencing financial difficulties as early as 2003 or 2004. He testified that his business slowed when an insurance company he wrote policies for decided to exit the coastal market. However, in recorded telephone conversations between Everett and a Compass representative that the Colliers played for the jury, Everett attributed his financial difficulties to a recent separation and divorce proceedings, along with illness and loss of multiple family members.

In 2012, the Colliers fell several months behind on their mortgage payments. In July 2012, Compass notified the Colliers that because they failed to make payments in May, June, and July, they breached the mortgage agreement and needed to cure the default or Compass would accelerate the note. In November of 2012, after the Colliers failed to cure the default, Compass sent a notice of intent to foreclose and indicated that a payment of $4,525.64 was necessary to reinstate the terms of the loan.[3]

Everett called Compass in January of 2013, and he spoke with a representative who advised that he could not make payment arrangements with the collections department because the account was so far past due; instead, she asked if he was interested in a loan modification. The representative explained that the loan was being handled by the foreclosure department, so he would not be able to make any payment arrangements, and the only thing the bank would accept to forego foreclosure was for the account to be brought totally current. During the call, the representative told Everett the bank needed certain documentation for the modification application, including a hardship letter, two pay stubs, a profit and loss statement from the prior year, two years of tax returns, and two months of bank statements. The representative advised that if the bank granted the modification, it

---

[3] Evidence admitted at trial indicated that Everett eventually made a payment in October 2012; however, this was not enough to cure the default.

usually put people on a three-month trial payment plan and once the trial payments were received, they would "re-do the note." She explained that the bank would lower the payment amounts with the modification, and everything past due would be "rolled into the new note."

On July 10, 2013, Compass sent a letter to the Colliers which provided:

BBVA Compass, by virtue of this letter, is entering into an agreement to offer you hardship assistance through the Loss Mitigation Department. Please review the terms and conditions and sign and return this Commitment Letter to me by July 17, 2013. Signatures of all parties who originally signed the loan documents will be required for this agreement to be valid.

Therefore, Lender and Borrowers hereby agree to the following terms and conditions:

1. Your loan modification is conditionally approved subject to the below conditions.
2. Lender and Borrowers acknowledge the outstanding principal balance for the Note as of the date hereof is $39,231.41. This figure is not a pay off quote; however, the principal balance only.
3. Due to your mortgage account being delinquent by more than one payment, BBVA Compass will enroll you in the Trial Period Payment Plan for three months. The Trial Period Payment Plan will commence on 8/19/13 and shall continue through 10/19/13. Each monthly payment shall be in the amount [of] $279.00. These payments must be received on or before each monthly due date to remain eligible for the Hardship Assistance Program. These payments will be used to pay towards the past due interest or fees.
4. If you successfully complete the trial period plan as outline[d] above, BBVA Compass agrees to modify your mortgage loan. The new interest rate will be 3.375% and the payment term will be extended out to 180 months. The new principal and interest payment is estimated to be

5

$279.00 and the escrow payment is estimated to be $406.65. We estimate the total new loan payment will be $685.65.

5. BBVA Compass requires a satisfactory title search on the collateral property prior to final closing to ensure our lien will remain in first place position.

6. BBVA Compass requires a satisfactory appraisal to determine the market value and condition of the collateral property located at [the Colliers' home address].

7. BBVA Compass also requires a satisfactory active home owner's insurance policy on the collateral property at the time of closing with adequate coverage to insure our lien against the collateral property.

8. We are currently escrowing for taxes and insurance in the amount of $406.65 monthly. This figure is subject to change, and we have no control over the amount of the change once it occurs.

9. All other terms of the Note not specifically modified by nor in conflict with the terms of this agreement shall remain in force and effect.

10.All terms are subject to all underwriting conditions that may apply.

Borrower hereby agrees that the agreement contained herein shall in no manner affect or impair the Note, the repayment of the indebtedness evidenced hereby, the mortgage, any lien securing the note, or any loan documents controlling the disbursement of loan funds; Borrower hereby expressly acknowledging the validity and enforceability of the Note. Borrower further agrees that, in the event of a default under the Note, nothing contained herein shall preclude the holder of the Note from foreclosing the lien of the Mortgage or enforcing, in accordance with their terms, any other instruments evidencing or securing the indebtedness evidenced by the Note.

THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPO-RANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

Finally, please be advised that failure to sign and return this Commitment Letter and have it returned by July 17, 2013 will render this agreement null and void and your account terms will remain as agreed in your original loan documents.

The Colliers signed and returned the letter, which is the center of the parties' dispute.

In the trial court and on appeal, the Colliers contend the Commitment Letter constituted a valid contract entitling them to a loan modification, and therefore, Compass's subsequent denial of their loan modification breached the contract. At trial, the Colliers focused on the provision requiring three trial payments as being dispositive. Further, the Colliers contended that foreclosure attempts by Compass after this date violated the DTPA and TDCA, because they should have been operating under a modification agreement. Compass argued at trial and argues on appeal that this was not a valid contract, rather the Commitment Letter contained conditions precedent to the formation of a valid contract. In the alternative, Compass contends that even if a valid contract existed, it contained conditions subsequent or conditions that the Colliers had to perform before Compass was obligated to perform.

Everett continued to communicate with Compass following the Commitment Letter's execution. When Compass sent the letter, the IRS had already recorded multiple liens on the property due to the Colliers' failure to file tax returns in 2000, 2003, 2004, 2008, and 2009. Compass repeatedly told Everett they needed his tax

7

returns and, due to the IRS liens, Compass required proof of an IRS repayment plan or some other documentation showing the IRS would subrogate the tax liens. For months, Everett told Compass he was trying get his tax returns filed and that the IRS would not agree to a repayment plan until he filed his returns. The IRS placed additional liens on the property in September of 2013 for tax years 2010 and 2011. Finally, in November of 2013, Compass advised the Colliers it could not approve the modification after they received written confirmation from Everett that the IRS would not agree to a repayment plan absent his tax returns and Everett had not filed his tax returns.

After this initial failed modification attempt, Everett subsequently reapplied at least twice for loan modifications. Compass rejected these subsequent modification applications due to Everett's continued failure to provide his filed tax returns or proof of an approved IRS repayment plan. Compass ultimately moved to foreclose on the property. The Colliers sought a temporary restraining order to stop the foreclosure and simultaneously sued Compass alleging breach of contract, DTPA violations, and TDCA violations.

At trial, Compass moved for directed verdict arguing that the statute of limitations barred the Colliers' DTPA claim and a mortgage does not qualify as a good or service under the DTPA. Compass further argued that the breach of contract claim failed because a loan modification commitment letter was not a contract as a

8

matter of law. Compass complained that no evidence existed that Compass harassed the Colliers or engaged in conduct that violated the TDCA. The trial court overruled the motion for directed verdict.

The trial court's charge to the jury contained a question asking if Compass failed to comply with the "July 10, 2013 agreement." Compass objected to the submission of the question and argued the Commitment Letter was not a contract. Compass then requested that the trial court submit two additional questions, one regarding contract formation and a separate question regarding whether all parties complied with the terms of the "agreement." The trial court refused to submit Compass's proposed questions to the jury or otherwise include a contract formation question in the charge. The jury found that Compass failed to comply with the agreement.

The trial court also submitted questions regarding Compass's alleged DTPA violations and TDCA violations after December 29, 2013. The jury answered the questions affirmatively, finding that Compass engaged in conduct that knowingly violated the DTPA and that it violated the TDCA. The jury awarded damages under each cause of action, damages for mental anguish, damages for the "knowing" DTPA violation, and attorney's fees.

## II. Issue One: Breach of Contract

Compass first argues that "the Colliers' breach of contract claim fails because the Commitment Letter was not a valid, enforceable contract to permanently modify the loan as a matter of law." Specifically, Compass contends that the Commitment Letter contained numerous conditions precedent to the formation of a contract, and even if a contract had been created, the Colliers were barred from recovering for any breach because they failed to perform and had not paid their mortgage in years. Compass contends there was insufficient evidence, both legally and factually, that the Colliers satisfied the conditions precedent, and consequently, no valid, enforceable contract existed.

In a legal sufficiency challenge, we credit evidence that favors the finding, if a reasonable factfinder could, and we disregard evidence contrary to the challenged finding unless reasonable factfinders could not disregard it. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). When a party challenges the legal sufficiency of the evidence on an issue for which it did not have the burden of proof, the appellant must demonstrate there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). In reviewing a no-evidence challenge, we view the evidence in the light most favorable to the verdict. *Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex. 1992). We cannot sustain a legal insufficiency, or no evidence point, unless the record shows:

10

(1) . . . complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact.

*Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (citations omitted).

When examining the factual sufficiency of the evidence, we examine the entire record, considering the evidence both in favor of and contrary to the challenged finding. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). After considering all the evidence, we only set aside the finding if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *see also Windrum v. Kareh*, 581 S.W.3d 761, 781 (Tex. 2019). In reviewing factual sufficiency, we do not substitute our judgment for the jury's. *See Windrum*, 581 S.W.3d at 781. We must "detail the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust[,] . . . shocks the conscience[,] or clearly demonstrates bias." *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (quoting *Pool*, 715 S.W.2d at 635). We must also "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict[,]" since that is the

only way to ascertain whether we satisfied the requirements set out in *In re King's Estate*, 244 S.W.2d 660, 661 (Tex. 1951). *See id.*

"Before we can measure the sufficiency of the evidence, we must first identify the standard against which the evidence is to be measured." *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002). If a party fails to object to the charge, we measure the sufficiency of the evidence against the jury charge submitted. *See id.*; *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). For us to measure the sufficiency of the evidence against the charge the trial court should have submitted, Compass had to object to the question "stating with particularity the reasons therefore." *See West Telemktg. Corp. Outbound v. McClure*, 225 S.W.3d 658, 664–65 (Tex. App.—El Paso 2006, pet. granted, judg't vacated w.r.m.) (citing Tex. R. Civ. P. 274; *St. Joseph Hosp.*, 94 S.W.3d at 530).

The first question the trial court submitted to the jury asked, "Did Compass fail to comply with the July 10, 2013 Agreement?" During the charge conference, Compass objected to the question arguing "it leaves out an important fact that we believe the letter agreement of July 10, 2013 is not an agreement, as we cited case law on this issue. It is not a contract." Compass then submitted two proposed questions, which the trial court refused.[4]

---

[4] Compass submitted the following questions for inclusion in the court's charge: (1) "Did Compass intend for the July 10, 2013 letter agreement to be a

12

The Texas Supreme Court has explained that

[t]here should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling. The more specific requirements of the rules should be applied, while they remain, to serve rather than defeat this principle.

*State Dept. of Highways & Public Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992). In *Payne*, the Court determined that an element of a premises defect claim was not included in the broad-form charge the trial court submitted to the jury, and the element could not be deemed in Plaintiff's favor because the defense objected to the omission by requesting a jury question on that issue; therefore, the verdict did not support the judgment in the plaintiff's favor. *See id.*

Compass made the trial court aware through its objections and proposed questions that a dispute existed regarding the formation of a valid contract, specifically, the element of intent to be bound. *See* Tex. R. Civ. P. 278 (noting that objection to failure to submit a question shall suffice in such respect if the question is one relied upon by the opposing party); *Childress Eng'g Servs., Inc. v. DeLeon*, No. 05-16-00429-CV, 2017 WL 5898520, at *2 n.2 (Tex. App.—Dallas Nov. 29, 2017, pet. denied) (mem. op.) (explaining that plaintiff had the burden of proving

completed loan modification?" and if the jury responded affirmatively to the first question, to then answer (2) "Were all the terms of the July 10, 2013 letter agreement complied with?" We express no opinion on whether these proposed questions were in substantially correct form.

breach of contract, thus defendant's objection to the omission during the charge conference was sufficient to preserve error); *see also Payne*, 838 S.W.2d at 241. Therefore, Compass properly preserved its objection to the charge by identifying the error "with sufficient specificity to make the trial court aware of the complaint[.]" *See* Tex. R. App. P. 33.l(a)(l)(A); *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43–44 (Tex. 2007). Accordingly, we measure Compass's complaint regarding the sufficiency of the evidence against the charge the trial court should have submitted. *See* Tex. R. Civ. P. 274; *St. Joseph Hosp.*, 94 S.W.3d at 530; *Tractebel Energy Mktg., Inc. v. E.I. Du Pont De Nemours and Co.*, 118 S.W.3d 60, 68–69 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). However, while we are not examining a charge error issue, we note that such error is reversible because the jury was not asked to decide an essential and disputed element of a breach of contract claim, namely the existence of a valid contract. *See Ledesma*, 242 S.W.3d at 43–44. "If a cause of action consists of more than one element, and an element is omitted from the charge 'without request or objection,' the missing element can be found by the trial court or deemed found if certain requirements are met." *Id.* at 44 (citation omitted). However where, as here, a proper objection is made about the existence of an element, the failure to include it is reversible error. *See id.* (citation omitted).

The evidence and pleadings in this case raised the issue of whether the parties intended the Commitment Letter to be a binding agreement or whether it contained

14

conditions precedent to the formation of a valid contract; therefore, a question regarding contract formation, specifically intent, should have been submitted to the jury. *See* Tex. R. Civ. P. 278. ("The court shall submit the questions, instructions and definitions in the form provided by Rule 277, which are raised by the written pleadings and the evidence."). Whether this was the memorial of an already enforceable contract or merely outlined conditions precedent to the formation of a contract depends upon the parties' intent, which is usually a question for the trier of fact. *R.R. Comm'n of Tex. v. Gulf Energy Expl. Corp.*, 482 S.W.3d 559, 572–73 (Tex. 2016) (citing *Foreca, SA v. GRD Dev. Co.*, 758 S.W.2d 744, 745 (Tex. 1988); *Scott v. Ingle Bros. Pac. Inc.*, 489 S.W.2d 554, 556–57 (Tex. 1972)). The Texas Supreme Court recently acknowledged that in certain circumstances, intent to be bound could potentially be decided as a matter of law. *See id.* at 575; *see also Chalker Energy Partners III, LLC v. Le Norman Operating LLC*, 595 S.W.3d 668, 673 (Tex. 2020). Specifically, the Court explained,

> In *Gulf Energy*, we acknowledged that intent to be bound could potentially be decided as a matter of law. Though we held in *Foreca* that language stating that an agreement was "subject to legal documentation" gave rise to a fact issue, language that no contract will arise until a formal agreement is executed makes clear the parties' intent that the contemplated formal document is a condition precedent to contract formation. Thus, the fact that Chalker's alleged acceptance was "subject to a mutually agreeable PSA" does not create a fact issue; instead, it emphasizes that the definitive agreement referenced in the No Obligation Clause was a condition precedent to contract formation.

*Chalker Energy*, 595 S.W.3d at 673–74.

15

The case before us in this appeal is more akin though to *Gulf Energy* and *Foreca,* where a fact issue was left to be resolved regarding the parties' intent to be bound, rather than *Chalker Energy*. In this case, the purported agreement did not include a No Obligation Clause containing definitive language disavowing the existence of an agreement such that intent to be bound could be determined as a matter of law. Instead, the "subject to" or conditional language in the Commitment Letter gives rise to a question of fact as to whether the Commitment Letter contains conditions precedent to the formation of a binding agreement or whether the parties' intended to be bound upon the execution of the Commitment Letter. *Compare Gulf Energy*, 482 S.W.3d at 572–75; *Foreca*, 758 S.W.2d 745–46, *with Chalker Energy*, 595 S.W.3d at 673–74. Therefore, the trial court erred by resolving the contract-formation issue as a matter of law. *See Gulf Energy*, 482 S.W.3d at 575 (reaching the same conclusion and noting that whether there was a breach depended upon whether the parties had entered into a binding contract at the time).

The evidence must be legally and factually sufficient to support a finding that a valid contract existed, although the trial court refused to submit such a question to the jury. As submitted, the charge presumed the existence of a valid contract and allowed the jury to find that Compass failed to comply with an Agreement without first determining whether a valid contract existed, despite it being the parties' central dispute at trial. *See id.* (concluding that whether the parties intended to be legally

16

bound on a specific date was a disputed fact issue that should have been submitted to the jury).

The formation of a valid contract is a requisite element of a breach of contract cause of action. *See USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018) (citation omitted). A party must prove four elements to successfully establish a breach of contract cause of action: (1) formation of a valid contract; (2) performance by the plaintiff; (3) breach by defendant; and (4) the breach caused the plaintiff's damages. *S & S Emergency Training Sols, Inc. v. Elliott*, 564 S.W.3d 843, 847 (Tex. 2018) (citing *Menchaca*, 545 S.W.3d at 501 n.21). Before the Colliers could establish a cause of action for breach of contract, because it was a disputed issue, they first had to prove the formation of a valid contract. To prove the existence of a valid contract, a plaintiff must establish: (1) that an offer was made; (2) the other party accepted in strict compliance with the terms of the offer; (3) the parties had a meeting of the minds on the essential terms of the contract (mutual assent); (4) each party consented to those terms; and (5) the parties executed and delivered the contract with the intent that it be mutual and binding. *Menchaca,* 545 S.W.3d at 501 n.21. (citation omitted).

At issue is the last element of contract formation, which is whether the parties intended to be bound. Compass asserts that the letter contained conditions precedent to the formation of a valid agreement. "A condition precedent may be either a

condition to the formation of a contract or to an obligation to perform an existing agreement." *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976) (citations omitted). Therefore, conditions may "relate either to the formation of contracts or to liability under them." *Id.* A valid contract cannot exist if a condition precedent to its formation does not occur. *Fitzgibbon v. Hughes*, No. 04-13-00261-CV, 2014 WL 3747247, at *3 (Tex. App.—San Antonio July 30, 2014, no pet.) (mem. op.). The party seeking to recover under the contract has the burden to prove all conditions precedent have been satisfied.[5] *Assoc. lndem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998).

When a contract is unambiguous, the construction of the written instrument is a question of law for the court which is reviewed *de novo*. *MCI Telecomm. Corp. v.*

---

[5] On appeal the Colliers argue that their petition contained language that all conditions precedent had been met and because Compass's answer did not specifically deny this, they did not have the burden of proving them. We disagree. The record from the trial makes it clear that the primary dispute in this case was the formation of a valid contract and the bank's assertion that the Colliers failed to satisfy conditions precedent. The parties tried this issue by consent, and before the case was submitted to the jury, the Colliers failed to raise any objection to Compass's alleged pleading deficiency regarding the denial of conditions precedent. The Colliers cannot raise this alleged pleading deficiency for the first time on appeal. *See Roark v. Stallworth Oil and Gas, Inc.*, 813 S.W.2d 492, 495 (Tex. 1991) ("The party who allows an issue to be tried by consent and who fails to raise the lack of a pleading before submission of the case cannot later raise the pleading deficiency for the first time on appeal."); *Nat'l Convenience Stores, Inc. v. Erevia*, 73 S.W.3d 518, 522 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

18

*Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex. 1999) (citations omitted). We review a trial court's legal conclusions *de novo. Id.* "We review questions of contract formation and construction de novo." *Temp. Alts., Inc. v. Jamrowski*, 511 S.W.3d 64, 67 (Tex. App.—El Paso 2014, no pet.) (citing *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227–28 (Tex. 2003)). Whether the parties intended to enter into an agreement is generally a question of fact. *Gulf Energy Expl.*, 482 S.W.3d at 572–73 (citing *Foreca*, 758 S.W.2d at 745; *Scott*, 489 S.W.2d at 557). If the written instrument is worded so it can be given a certain or definite legal meaning, then it is not ambiguous, and the court will construe the contract as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). If the contract is subject to two or more reasonable interpretations, it is ambiguous. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (citations omitted). A trial court *determines* as a question of law whether a contract is ambiguous by looking at it as a whole in light of the circumstances present when the contract was entered. *Coker*, 650 S.W.2d at 394 (emphasis added). If a contract contains an ambiguity, a fact issue exists. *Id.*

Conflicting language exists in the Commitment Letter, particularly when comparing certain language that referred to it as a "final agreement" and other conditional language such as "conditionally" and "subject to" leading us to conclude an ambiguity exists. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157

19

(Tex. 2003) (noting that an ambiguity exists when the contract language is susceptible to two or more reasonable interpretations). Moreover, one term indicated that all the Colliers needed to do was complete the trial payments and the mortgage would be modified, which contradicts the conditional language elsewhere in the Commitment Letter. *See id.* Since we have determined an ambiguity exists, parol evidence is relevant to the parties' intention to be bound. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 907 S.W.2d at 520 (noting parol evidence is admissible to resolve ambiguity). We may look to prior negotiations and all other relevant incidents to determine the intent of the parties. *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 848 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

## A. Legal Sufficiency

We first address whether the evidence was legally sufficient to establish the existence of a valid contract. The Colliers presented testimony that Compass offered to modify their loan in the form of the Commitment Letter and they submitted recorded phone conversations with a representative of Compass to support this contention. Additionally, the trial court admitted a recorded phone conversation between Everett and a Compass representative indicating the underwriters "conditionally approved [it] for modification" and the bank would fax a letter requiring his signature. The letter also provided evidence that the Colliers agreed to the terms of the offer as shown by the Colliers' signatures. Everett testified that once

20

he signed the Commitment Letter and returned it to the bank, he believed he had an agreement with the bank.

The Colliers submitted some evidence that the parties had a meeting of the minds, which included recorded phone conversations discussing the Colliers' trial payments and Compass's receipt of those payments in accordance with the written letter. This evidence, coupled with the Commitment Letter, also went to the parties' consent to the terms and to the last element of contract formation, specifically that the parties executed and delivered the contract with the intent that it be mutual and binding. Considering the foregoing, we conclude the evidence was legally sufficient to support the existence of a valid contract and that Compass breached the agreement.

**B. Factual Sufficiency**

We now turn to the factual sufficiency of the evidence. In so doing, we examine the evidence offered by both parties to determine whether the result was manifestly unjust. *See Jaffe Aircraft Corp. v. Carr*, 867 S.W.2d 27, 28 (Tex. 1993). Much of the Colliers' evidence focused on the third and fourth terms of the Commitment Letter, while disregarding the remaining terms outlined therein. The primary dispute was whether the Commitment Letter was a valid contract, and specifically a question regarding the parties' intent to be bound. Accordingly, that is where we focus our factual sufficiency inquiry.

21

Part of the evidence offered by the Colliers and admitted by the trial court over the bank's objection included a summary of recorded phone conversations taking only portions favorable to the Colliers and omitting evidence to the contrary. Language in the Commitment Letter included that they were "entering into an agreement to offer you hardship assistance" and that Compass would enroll the Colliers in the "Trial Period Payment Plan for three months." The Commitment Letter shows the Colliers' signatures.

Whether the parties intended for the Commitment Letter to be binding was hotly contested. The Commitment Letter contained language requiring the Colliers to make three trial payments in the amount of $279.00 beginning in August of 2013, which neither party disputed were paid. The letter also provided "[i]f you successfully complete the trial period plan as outline[d] above, BBVA Compass agrees to modify your mortgage loan" and specified the new interest rate, the payment terms, and the estimated total new loan payments. This is the strongest evidence in support of the Colliers' argument that they believed all they had to do was make the three trial payments for the modification to go through.

However, the first term of the letter provides that the Colliers' "loan modification is *conditionally* approved *subject to the below conditions*." (Emphasis added.) Another term of the letter required a "satisfactory title search" on the property to ensure Compass's lien remained in first place. Finally, the letter provided

that "[a]ll terms are *subject to* all underwriting *conditions* that may apply." (Emphasis added.) Evidence admitted at trial showed the IRS recorded a notice of tax liens on December 20, 2012, totaling $78,285.47 for years 2003, 2004, 2008, and 2009; there was also another tax lien for 2000 in the amount of $1979.00. In September 2013, the IRS filed an additional notice of tax lien for tax years 2010 and 2011. Everett explained at trial that the IRS liens were a result of his failure to file returns for those years.

Additionally, parol evidence in the form of recorded conversations admitted at trial beginning with the first conversation between Everett and Compass established that the bank advised Everett it required certain items for the modification application. Those items included a hardship letter, two pay stubs, a profit and loss statement from the prior year, two years of tax returns, and two months of bank statements, in addition to the trial payments. The representative also asked Everett what his plans were in the event the modification was not approved.

Everett told the jury that Compass never said they could not offer a modification if there was a federal tax lien. Everett testified at trial that the first thing he told Compass was that he had a tax lien, but he was working on getting it taken care of, evidencing Everett's awareness the tax liens were a potential issue. In another recorded conversation admitted at trial, the Compass representative advised Everett that the underwriter reviewed the account and "it is conditionally approved

23

for modification." In the same conversation, the Compass representative testified that the *first* thing Everett would have to do is complete the three-month temporary payment plan running from August 2013 to October 2013. (Emphasis added.) This is evidence that Compass required the performance of additional tasks beyond the trial payments. However, Everett testified at trial that he was happy because Compass would approve the modification, and once he signed the letter and sent it to Compass, he thought he had an agreement.

Everett testified that Compass told him he needed something from the IRS stating he was either making payments to them or working on an arrangement. A recorded phone conversation with a Compass representative on September 24, 2013, established that Compass received the second trial payment, and that once they received the third payment they would close if clear title existed to the property. During that conversation, Everett asked if they would be able to close without a problem if he made the final payment, to which the Compass representative responded that once the underwriter performed the title work "*if* there are no issues, then you should be fine." (Emphasis added.) Everett then told the representative that the only problem he had was with the IRS, and he was trying to resolve it. This is further evidence that closing on the modification could only occur if there was a clear title to the property and the underwriter found no issues with the title and that Everett realized the IRS liens were problems that he needed to resolve.

24

Evidence admitted at trial showed the parties identified the tax liens as an impediment to the modification process prior to Compass sending the Commitment Letter.[6] Specifically, a number of the tax liens were already placed on the property prior to Compass "conditionally" approving the loan modification. This also tends to support the Colliers' argument that Compass knew of the liens and did not care about them when the bank extended the offer to modify the loan.

Evidence revealed Compass repeatedly requested information from Everett showing the tax liens had been resolved, which Everett acknowledged, and he represented to Compass he was working on the issue; however, according to Everett, the IRS refused to set up a payment plan to resolve the tax liens until after he filed all of his missing tax returns, which he had not yet done. At trial, Everett testified that he spoke with Compass many times about the tax liens, and Compass advised him they needed written evidence that the IRS would not foreclose on its liens. The

_____

[6] In their brief, the Colliers argue that Compass tried to change the terms of the July 13 "agreement." They specifically pointed to the requirement of a "satisfactory title search prior to closing" and contended that the bank tried to change the term to require the Colliers to obtain an "IRS repayment plan." They contend this is strong evidence of Compass's breach. This argument lacks merit. There was evidence in the record that the IRS had placed multiple tax liens on the property threatening the priority of the bank's lien, which a title search revealed. Despite being given an opportunity to overcome the unsatisfactory title search by providing Compass with verification of a repayment plan to the IRS, the Colliers were unable to do so. Even if we determined this was a valid contract, these facts would be evidence of the Colliers' failure to perform by providing satisfactory title to the property rather than evidence of any breach by Compass.

recorded conversations through July of 2013 established a pattern of Compass inquiring about the tax liens and IRS repayment plan information, with Everett responding he was in the process of getting items to the CPA so he could file his delinquent tax returns.

Everett testified that he received correspondence from the IRS in August 2013 indicating it had rejected his proposed payment plan for tax years 2007–2009, which he forwarded to Compass. At trial, Everett admitted that as of September 24, 2013, the IRS liens remained an issue as they worked toward closing. Compass introduced evidence that as of October 2013, its representative again advised Everett that per the underwriter "there was an issue with your IRS, the taxes, and all of that information" and the underwriter wanted to know if he had proof about the liens, the judgment, and the exact amount he owed, because the information was necessary to complete the process. Everett also testified that in October of 2013, Compass's representative continued working with him to obtain tax information for the underwriter, so they could close on the modification, but he still did not have the tax information to provide to Compass.

Compass provided evidence in the form of a November 2013 recorded conversation, where its representative advised Everett they could not go through with the modification because the underwriter required proof he had an approved payment arrangement with the IRS, and the correspondence he sent from the IRS

was unacceptable. Compass explained during the conversation that without the tax information, he would have to start the process anew.

Everett testified that he subsequently re-applied for several other loan modifications with Compass, which Compass denied. At trial, Everett confirmed that he had many calls with Compass's representative which centered around his delinquent taxes and the records necessary to show he had an approved payment plan with the IRS. His subsequent attempts to re-apply for modifications is additional evidence that Everett knew he had not entered into a binding agreement with Compass modifying the loan.

Everett testified that he sent his trial payments in and believed Compass should have modified his mortgage. Despite Everett's testimony that he thought he had an agreement with Compass following the execution of the Commitment Letter, the evidence overwhelmingly established that before and after Compass sent the Commitment Letter, the IRS liens and missing tax returns were a significant issue for the bank and its underwriters, and Everett's awareness of this. Everett's repeated inquiries regarding the modification closing indicated that he knew the loan modification had not yet been approved at the time they signed the letter and returned it to Compass. Moreover, evidence established his cognizance of the issue's significance, and he repeatedly assured Compass he was taking steps to comply with their additional requests, like trying to file his delinquent tax returns, obtaining an

approved payment plan from the IRS, and forwarding additional correspondence from the IRS to the bank. Everett's testimony was that the executed Commitment Letter was a contract, whereas Compass's evidence showed the letter contained conditions precedent to the formation of a valid contract, such as meeting the underwriters' conditions and obtaining a satisfactory title report.

The Colliers emphasized that no IRS repayment plan was mentioned in the letter and that they made the required trial payments, while ignoring everything else the letter expressly required. Compass submitted evidence that the IRS lien issue and the requisite repayment plan fell under terms five and ten of the letter, specifically to ensure its lien remained in first place and that "[a]ll terms are subject to all underwriting conditions that may apply."

Despite the "final agreement" language in the Commitment Letter and Everett's testimony at trial that he believed once he made the three trial payments the loan should have been modified, the overwhelming evidence of intent as manifested by conditional language elsewhere in the Commitment Letter, coupled with the parties' conduct, runs contrary to the notion that a valid agreement to modify the loan existed once Everett made the trial payments. This is established by: (1) the requirement of a satisfactory title search; (2) the recorded conversations noting there were outstanding tax issues for which the underwriters required a resolution; (3) the Colliers' February 2014 handwritten correspondence to the IRS and Compass noting

28

that a modification could not go through unless they resolved the tax issues;[7] and (4) the evidence establishing that Everett continued to re-apply for loan modifications after the bank reported to him the first attempt was unsuccessful.

Compass's corporate representative testified that had the Colliers met the terms of the Commitment Letter, Compass would have agreed to modify the loan. She also testified that "it is an agreement that we agree to, conditionally approve it." The question remained as to whether this intent involved conditions precedent to the formation of a valid contract or "conditions subsequent" that the Colliers' were required to perform under a valid contract before Compass's performance was triggered, issues which the trial court refused to submit to the jury.

The great weight of the evidence from both parties consistently undermined the notion that they intended to be bound by the Commitment Letter once the Colliers signed it; however, the trial court decided the issue as a matter of law and refused to submit a jury question on this material and contested issue. To allow the jury's finding that Compass breached a contract when the evidence was factually insufficient to support the existence of a valid contract, particularly with respect to the parties' intent to be bound, would be manifestly unjust. *See Pool*, 715 S.W.2d at

---

[7] The Colliers' own exhibit showed that Everett handwrote a note to the IRS regarding his subsequent attempts to modify the loan and a certificate of subordination which said, "The mortgage [company] will only do this without the federal tax lien on my property."

635. In this situation, the Colliers failed to provide documentation requested by the bank for approval of the loan modification, which is proof of filing of certain delinquent IRS tax returns and a clear title to the collateral. To allow this verdict to stand shocks the conscience of the court. Since Compass objected to the trial court's charge on the basis that the Commitment Letter did not constitute a contract, we measure the sufficiency of the evidence against the charge the court should have submitted. *See* Tex. R. Civ. P. 274; *St. Joseph Hosp.*, 94 S.W.3d at 530. Having concluded the evidence was factually insufficient to support the existence of a valid contract, and specifically, the parties' intent to be bound versus the creation of conditions precedent, we sustain Compass's first issue. We reverse the trial court's judgment and remand for a new trial on the Colliers' breach of contract cause of action.

### III. Issue Two: Texas Deceptive Trade Practices Act

In its second issue, Compass asserts that the Colliers' DTPA claim fails as a matter of law because the Colliers do not qualify as consumers. *See* Tex. Bus. & Com. Code Ann. §§ 17.41 *et seq*. "To recover under the DTPA, a plaintiff must show that: (1) he is a consumer; (2) the defendant engaged in a false, misleading, or deceptive act; and (3) the act constituted a producing cause of the plaintiff's damages." *Sparks v. Booth*, 232 S.W.3d 853, 864 (Tex. App.—Dallas 2007, no pet.) (citing Tex. Bus. & Com. Code Ann. § 17.50(a); *Doe v. Boys Clubs of Greater Dall.,*

*Inc.*, 907 S.W.2d 472, 478 (Tex. 1995)). The question of consumer status is one of law. *See Ortiz v. Collins*, 203 S.W.3d 414, 424 (Tex. App.—Houston [14th Dist.] 2006, no pet); *Kenneth H. Hughes Interests, Inc. v. Westrup*, 879 S.W.2d 229, 234 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (noting that a plaintiff's "consumer" status under the DTPA is a question of law). Consumer status depends on the transaction, not the contractual relationship between the parties. *Sparks*, 232 S.W.3d at 864 (citations omitted). Because a plaintiff's consumer status under the DTPA is a question of law, we conduct our review *de novo*. *See AdvoCare Intern., L.P. v. Ford*, No. 05-10-00590-CV, 2013 WL 505210, at *2 (Tex. App.—Dallas 2013, pet. denied) (mem. op.).

"Generally, a person cannot qualify as a consumer if the underlying transaction is a pure loan because money is considered neither a good nor a service." *Fix v. Flagstar Bank, FSB*, 242 S.W.3d 147, 160 (Tex. App.—Fort Worth 2007, pet. denied) (citing *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 173–74 (Tex. 1980)). The Texas Supreme Court explained that borrowers can qualify as consumers if they borrow money for the purpose of buying a good or service and their complaint concerns the good or service they purchased. *See Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705, 707 (Tex. 1983); *Ebrahimi v. Caliber Home Loans, Inc.*, No. 05-18-00456-CV, 2019 WL 1615356, at *8 (Tex. App.—Dallas Apr. 15, 2019, pet. denied) (mem. op.). However, "[b]ecause a person seeking to renew or extend a

31

pre-existing loan is not seeking goods or services, he or she does not qualify as a 'consumer' under the definition of the DTPA; thus, this type of transaction is not subject to a DTPA claim." *Bailey v. Bank of Am., N.A.*, No. 02-13-00092-CV, 2014 WL 982363, at \*5 (Tex. App.—Fort Worth Mar. 13, 2014, no pet.) (mem. op.) (citations omitted). A modification is similar to refinancing in that it is not sought for the acquisition of a good or service, but instead to finance an existing loan on previously acquired property. *Miller v. BAC Home Loans Servicing, L.P.*, 726 F.3d 717, 725 (5th Cir. 2013) (citations omitted).

Here, the Colliers argue that because they obtained the original loan to expand their house, they borrowed the money to buy a good or service. We disagree. Even if the Colliers utilized their initial refinance loan funds to add onto their house, evidence at trial established that Everett added onto the home by doing the construction work himself in 2002 or 2003. None of the Colliers' evidence of alleged deceptive trade practices pertains to the actual home sales transaction or to a deceptive act related to the original financing of their home. *See Reule v. M & T Mortg.*, 483 S.W.3d 600, 614 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (noting *Flenniken* exception did not apply where none of plaintiff's DTPA violation evidence pertained to the actual sales transaction or to a deceptive act related to the original financing of the home). The Colliers did not seek to acquire a good or service. Rather, through the modification, the Colliers merely attempted to re-

32

finance an existing loan on a previously acquired property. *See Miller*, 726 F.3d at 725.

We believe this case is similar in some key respects to *Riverside National Bank v. Lewis*, where the plaintiff sought to borrow money to avoid repossession of his car. 603 S.W.2d at 175. The court explained the plaintiff "sought to exchange future amounts of money for that amount which he desired to have in the present." *Id.* Similarly, the Colliers, through a loan modification sought to stop foreclosure on their home by having amounts of money they currently owed under their note rolled into a new loan with the extension of additional credit and a longer repayment term. The Colliers do not qualify as "consumers" under the DTPA as a matter of law. *See id.*; *see also Reule*, 483 S.W.3d at 614; *Miller*, 726 F.3d at 725. We sustain Compass's second issue. We reverse the trial court and render judgment that the Colliers take nothing on their DTPA cause of action against Compass.

## IV. Issue Three: Texas Debt Collection Act

In its third issue, Compass contends that loan modifications are not actionable under the TDCA. *See* Tex. Fin. Code Ann. §§ 392.001 *et seq.* In response, the Colliers argue their complaints are not limited to modification but also include

Compass's attempts to wrongfully foreclose and misrepresentations of the amounts owed in violation of the TDCA.[8]

The TDCA and specifically section 392.304(a)(8), prohibits the use of "fraudulent, deceptive, or misleading representation" by a debt collector, including "misrepresenting the character, extent, or amount of consumer debt[.]" *See* Tex. Fin. Code Ann. § 392.304(a)(8); *Chavez v. Wells Fargo Bank, N.A.*, 578 Fed. App'x. 345, 348 (5th Cir. 2014). Federal courts interpreting the TDCA have repeatedly held that "statements regarding loan modifications do not concern the 'character, extent, or amount of consumer debt' under section 392.304(a)(8). *Chavez*, 578 Fed. App'x. at 348 (citing *Miller*, 726 F.3d at 723).

Section 392.304(a)(19) is considered a catch-all provision that prohibits the use of "any other false representation or deceptive means to collect a debt or obtain information concerning a consumer." *See* Tex. Fin. Code Ann. § 392.304(a)(19);

---

[8] This argument is similar to the argument made by the borrowers in *Thomas v. EMC Mortgage Corporation*, where they maintained that the lender's failure to modify their loan, despite promising to do so, "misrepresent[ed] the character, extent, or amount of a consumer debt" in violation of the Texas Debt Collections Act. *See* 499 Fed. App'x. 337, 343 (5th Cir. 2012) (citing Tex. Fin. Code Ann. § 392.304(a)(8)). The Fifth Circuit rejected that argument and determined "[d]iscussions regarding loan modifications or a trial payment plan are not representations, or misrepresentations, of the amount or character of [a] debt." *Id.* (citations omitted). The Fifth Circuit pointed to the parties' loan repayment agreements, which similar to the Commitment Letter the Colliers signed, preserved the lender's remedies under the original note. *See id.*

*Chavez*, 578 Fed. App'x. at 348; *see also Thompson v. Bank of Am., N.A.*, 13 F.Supp.3d 636, 658 (N.D. Tex. 2014). To maintain a claim under section 392.304(a)(19), a plaintiff needs to allege that the debt collector made an "affirmative statement" that was false or misleading. *Thompson*, 13 F.Supp.3d at 657 (quoting *Williams v. Wells Fargo Bank, N.A.*, 560 Fed. App'x. 233, 240–41 (5th Cir. 2014)); *see also Kruse v. Bank of New York Mellon*, 936 F.Supp.2d 790, 792 (N.D. Tex. 2013).

The Colliers rely on the same conduct by Compass in support of their contention that Compass violated both TDCA provisions. They argue that Compass attempted to foreclose without authority and misrepresented amounts owed following the "modification" that Compass denied. On appeal, they point to trial testimony and exhibits describing Compass's conduct, most of which occurred prior to December 29, 2013; however, due to the statute of limitations, the questions submitted to the jury only pertained to actions after this date. The Colliers further complain that Compass failed to properly apply payments and that the bank promised not to foreclose while they "worked out the tax lien[.]" To the extent that any of this conduct occurred after December 29, 2013, it is tied to the assumption that the loan was modified. Under the Colliers' theory, the impropriety of this conduct is dependent upon the existence of a valid loan modification agreement. However, when the Colliers signed the Commitment Letter, they acknowledged the

principal amount owed on the note. They expressly recognized that the Commitment Letter "in no manner affect[ed] or impair[ed] the Note," and agreed that "in the event of a default under the Note, nothing contained herein shall preclude the holder of the Note from foreclosing the lien of the Mortgage[.]" The original note and deed of trust provided terms for default, acceleration, and foreclosure.

The Colliers offered no evidence at trial that because of Compass's affirmative statements, the Colliers were unaware that they: (1) had a mortgage obligation; (2) had defaulted on their loan; (3) owed a specific amount to cure their default; or (4) Compass was pursuing foreclosure. *See Thompson*, 13 F.Supp.3d at 658. Rather, the evidence at trial, including the Colliers' own testimony and their handwritten notes to the IRS and Compass conclusively established that they received notices expressly advising them of their default, the amount they owed, the necessary steps to cure, and the risk of foreclosure. *See id.*; *see also Miller*, 726 F.3d at 723 (affirming dismissal of § 392.304(a)(8) claim where the plaintiffs "always were aware (i) that they had a mortgage debt; (ii) of the specific amount they owed; (iii) and that they had defaulted," and nothing suggested the lender led them to believe differently).

Regarding Compass's alleged failure to properly apply payments, even if true, "nothing in the TDCA specifically makes misapplication of a payment or failure to apply a payment a prohibited misleading practice." *See Shellnut v. Wells Fargo*

36

*Bank, N.A.*, No. 02-15-00204-CV, 2017 WL 1538166, at \*14 (Tex. App.—Fort Worth Apr. 27, 2017, pet. denied) (mem. op.); *see also Ebrahimi*, 2019 WL 1615356, at \*5. Likewise, any representation by Compass that it would not foreclose is not actionable, because it is not a misrepresentation of the "character, extent or amount of a consumer debt[.]" Tex. Fin. Code Ann. § 392.304(a)(8); *Ebrahimi*, 2019 WL 1615356, at \*6; *see also Thompson*, 13 F.Supp.3d at 658 (quoting *Garza v. EMC Mortg.*, No. 3:11-CV-3504-M(BF), 2014 WL 1016958, at \*5 (N.D. Tex. Mar. 14, 2014)) (explaining that discussions "regarding loan modification or the postponement of foreclosure 'are not representations or misrepresentation of the amount or character of a debt'"). Nor do those discussions constitute "deceptive means" to collect a debt. *Garza*, 2014 WL 1016958, at \*5 (citation omitted).

Under Texas law, a promise to do or refrain from doing an act in the future is not actionable unless the party made the promise without the intention of performing at the time it was made. *Ebrahimi*, 2019 WL 1615356, at \*6 (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998)). The Colliers do not allege that Compass made the promise to delay foreclosure without the intention to do so at the time it made those representations nor is there evidence it lacked the intention to delay foreclosure when it made that representation. Furthermore, agreements to modify an existing loan agreement, including delaying foreclosure, are subject to the statute of frauds. *Id.* (citations

37

omitted). The Colliers rely on loan modification discussions in the Commitment Letter to support their section 392.304(a)(8) and (19) claims that Compass's foreclosure attempts were wrongful, but courts have "rejected similar TDCA claims arising from protracted loan-modification discussions that end in foreclosure." *See Clark v. Deutsche Bank Nat'l Tr. Co.*, 719 Fed. App'x. 341, 345 (5th Cir. 2018) (citations omitted); *Thompson v. Bank of Am. Nat'l Ass'n*, 783 F.3d 1022, 1026 (5th Cir. 2015).

The evidence establishes that the Colliers conceded they had a mortgage obligation, they defaulted on their loan, they owed a specific amount to cure their default, and were aware of the foreclosure risk. *See Thompson*, 13 F.Supp.3d at 658. The Colliers rely on statements pertaining to the modification to establish that Compass's attempts to foreclose allegedly violated the law, and therefore, we conclude they "do not concern the 'character, extent, or amount of consumer debt' under section 392.304(a)(8)." *See Chavez*, 578 F. App'x at 348 (citing *Miller*, 726 F.3d at 723). Accordingly, the Colliers' TDCA claims fail as a matter of law. We sustain Compass's third issue. We reverse and render judgment that the Colliers take nothing on their TDCA claims against Compass.

## V. Issue Four: Damages

Based on our resolution of issues one through three, we need not address Compass's fourth issue challenging the damages awarded. *See* Tex. R. App. P. 47.1.

38

## VI. Issue Five: Judicial Estoppel and Res Judicata

In its last issue, Compass argues that the Colliers' claims are barred by the doctrines of judicial estoppel and res judicata. Specifically, Compass argues that because the Colliers failed to disclose this cause of action to the bankruptcy court, the doctrine of judicial estoppel bars them from pursuing their claims in state court. Compass pleaded the affirmative defenses of judicial estoppel and res judicata in its amended answer to the Colliers' lawsuit. Following the jury's verdict, Compass filed a motion for judgment notwithstanding the verdict and argued, among other things, that the Colliers' lawsuit was barred by the doctrines of judicial estoppel and res judicata.

Judicial estoppel is an equitable doctrine that a court may apply when a party intentionally asserts contradictory facts or legal positions in one legal proceeding to acquire an unfair advantage in another. *See Espinosa v. Aaron's Rents, Inc.*, 484 S.W.3d 533, 541 (Tex. App.—Houston [1st Dist.] 2016, no pet.). We review the application of judicial estoppel for an abuse of discretion. *See Perryman v. Spartan Tex. Six Capital Partners, Ltd.*, 546 S.W.3d 110, 117 (Tex. 2018). When estoppel involves a separate bankruptcy proceeding, courts apply federal law to determine whether a defendant proved as a matter of law judicial estoppel bars a plaintiff's lawsuit. *See id.* (applying federal case law regarding estoppel to discussions of a

prior bankruptcy proceeding); *Tow v. Pagano*, 312 S.W.3d 751, 756 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

As an affirmative defense, Compass was required to conclusively establish the following: (1) the Colliers asserted a legal position in this state court proceeding that is clearly inconsistent with their prior position in the bankruptcy court; (2) a court accepted their prior position; and (3) the non-disclosure was intentional and not inadvertent. *See Espinosa*, 484 S.W.3d at 541; *Bailey v. Barnhart Interest, Inc.*, 287 S.W.3d 906, 911 (Tex. App.—Houston [14th Dist.] 2009, no pet.). "Judicial acceptance 'means only that the first court has adopted the position urged by the party, either as a preliminary matter or as part of a final disposition.'" *Bailey*, 267 S.W.3d at 911 (quoting *In re Coastal Plains*, 179 F.3d 197, 206 (5th Cir. 1999)). If the debtor lacks knowledge of the inconsistent position or has no motive for it, then the inconsistency is inadvertent. *See id.*

Res judicata prohibits relitigating claims which were finally adjudicated or arising out of the same subject matter that could have been litigated in the prior action. *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex. 1996); *Barr v. Resolution Tr. Corp.*, 837 S.W.2d 627, 628 (Tex. 1992). Res judicata requires a party to prove these elements: "(1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised

40

in the first action." *Amstadt*, 919 S.W.2d at 652 (citing *Tex. Water Rights Comm'n v. Crow Iron Works*, 582 S.W.2d 768, 771–72 (Tex. 1979)).

Our review of the record does not reveal that Compass established its entitlement to the application of these equitable doctrines as a matter of law. With respect to judicial estoppel, Everett testified that at the time he prepared the bankruptcy schedules, he did not know that he had a potential lawsuit against Compass. The evidence established that the bankruptcy court dismissed the bankruptcy proceeding, although conflicting information existed regarding the reason for the dismissal. We cannot say that Compass established the bankruptcy court's acceptance of the position. Accordingly, we conclude the trial court's refusal to apply either of these doctrines was not an abuse of discretion. We overrule Compass's fifth issue.

## VII. Conclusion

Because we have determined that the Colliers do not qualify as "consumers" under the DTPA and that Compass's conduct following December 29, 2013, did not involve misrepresenting or making affirmative statements regarding the character, amount, or extent of the Colliers' debt under the TDCA, those claims fail as a matter of law, and the trial court erred in submitting them to the jury. We reverse and render judgment that the Colliers take nothing on those claims. *See* Tex. R. App. P. 44.1. We further conclude the evidence did not support the jury's finding that Compass

41

breached an agreement, because the Colliers' failed to establish all the elements of their breach of contract cause of action by factually sufficient evidence, particularly the existence of a valid contract. The question of the parties' intent was dispositive of the issue, and the trial court erroneously refused to submit a jury question on that issue. Accordingly, we reverse the judgment of the trial court and remand only the Colliers' breach of contract cause of action for a new trial on the merits.

REVERSED AND REMANDED IN PART, RENDERED IN PART.

_____
CHARLES KREGER
Justice


Submitted on November 14, 2019
Opinion Delivered November 5, 2020

Before McKeithen, C.J., Kreger and Johnson, JJ.